IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LIONELL THOLMER,

    Plaintiff,                      No. CIV S-04-1368 GEB CMK P

   vs.

CHERYL K. PLILER, et al.,

    Defendants                  FINDINGS & RECOMMENDATIONS

                                /

        Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is Defendants' motion for summary judgment (Doc. 127). Plaintiff filed an opposition[1] to the motion (Doc. 141), and Defendants filed a reply (Doc. 146, 147). Plaintiff also filed a motion for summary judgment (Doc. 154, 155), to which Defendants filed an opposition (Doc. 156).

---

[1] In his opposition, Plaintiff stated he had been temporarily transferred to another institution and was not in possession of his legal documents. He requested the court not rule on the pending motion until he was reunited with all of his legal documents. Prior to the court addressing the motion for summary judgment, Plaintiff was returned to Pelican Bay and reunited with his legal documents. Thereafter, Plaintiff filed his motion for summary judgment, which appears to be more of an opposition than a cross-motion. The undersigned finds it appropriate to address both motions together.

1

# I. BACKGROUND

## A. Plaintiff's Allegations

This action proceeds on Plaintiff's third amended complaint (Doc. 91). Plaintiff claims that his First and Fourteenth Amendment rights have been violated by the Defendants' actions in retaining him in administrative segregation. Plaintiff claims the Defendants refused to allow him to call witnesses and present evidence at his retention hearing, and acted in retaliation for litigating against official corruption.

## B. Undisputed Facts

In April 2003, Plaintiff was incarcerated in California State Prison Sacramento (SAC). He is a level four prisoner who has been housed on the Sensitive Needs Yard (SNY) since August 2000. On April 16, 2003, inmate Lyons threatened Plaintiff because Lyons believed Plaintiff had told the control officer that Lyons had failed to clean the showers. Plaintiff overheard Lyons tell inmate Wagner that Plaintiff had "committed suicide" by snitching on him. On April 17, 2003, Plaintiff reported to Sergeant Williams that Lyons had made threats against Plaintiff's life and to assault Officer Grady, but Plaintiff was not sure about how serious Lyons's threats were. Plaintiff was interviewed that day by Officer Hodgkins of the Investigative Services Unit (ISU) about the threats he reported Lyons had made against Officer Grady and himself.

That same day, April 17, 2003, Plaintiff was placed in administrative segregation (Ad/Seg) by Lieutenant Banks. The reason provided on the CDC 114-D form was due to safety of self or others and institutional security.[2] Plaintiff acknowledges receiving a copy of this form. On April 18, 2003, Captain Mayfield met with Plaintiff in Ad/Seg and reviewed the order, which Plaintiff refused to sign because he disagreed with the allegations made and the actions taken.

///
///

---

[2] Plaintiff disputes the veracity of the reason, but does not dispute that was the reason provided on the form.

On April 23, 2003, Plaintiff appeared before the Institution Classification Committee (ICC) for a hearing chaired by defendant Rosario. Defendants Walker, Martin and Mayfield, as a recorder, were present at the meeting. While in Ad/Seg, Plaintiff was single celled and on "Walk Alone Yard" status.

Plaintiff reappeared before the ICC on May 14, 2003, for a hearing chaired by defendant Rosario to consider his retention in Ad/Seg. Sergeant Tennison, Dr. Martin, and defendants Mayfield and Mini, as a recorder, were present at the meeting. On May 15, 2003, Officer Lynch interviewed Plaintiff about his enemy concerns as documented on his CDC 812 enemy list. Plaintiff affirmed that he had at least 31 enemies located state wide. On June 18, 2003, Plaintiff reappeared before the ICC for a hearing chaired by Officer Stiles. Sergeant Tennison, Dr. Martin, and defendant Mini, as a recorder, were present at the meeting. Plaintiff declined to appear at the hearing due to a toothache. The ICC recognized that Plaintiff could not be housed in any of the States' SNY safely, and therefore recommended indeterminate SHU placement.[3] The ICC also referred Plaintiff's case to the Departmental Review Board (DRB) to determine his housing alternative and enemy evaluation.

On June 1, 2003, Plaintiff was interviewed by defendant Wilson to discuss Plaintiff's enemy concerns. On July 14, 2003, defendant Warden Pliler's staff issued a memorandum to refer Plaintiff's case to the DRB for alternate housing consideration. Defendant Pliler's staff considered possible housing options for Plaintiff in a memo, and recommended that Plaintiff be transferred to Pleasant Valley State Prison, level III SNY yard, with an override and indeterminate SHU term.

On August 19, 2003, Plaintiff reappeared before the ICC for a hearing chaired by defendant Stratton. Sergeant Tennison, Dr. Martin, Officer Stiles, and defendants Vance and

---

[3] Plaintiff disputes this statement not for the factual content, but due to his position that the defendants created the enemy situation at Folsom to keep him from being housed there. He does not dispute the fact that he could not be housed safely at any of the States' SNY.

3

1  Mini, as a recorder, were present at the meeting.

2          On September 9, 2003, Plaintiff was transferred to Salinas Valley State Prison,
3  Facility A.

4  **C.      Plaintiff's Dispute of Facts**

5          Plaintiff opposes several of Defendants' "undisputed facts" by stating he disputes
6  them. Plaintiff does not, however, provide any admissible evidence to support his position that
7  the facts alleged are disputable. For example, Defendants provide several reports Petitioner
8  disputes, but he does not provide any evidence in support of his position such as conflicting
9  reports or declaration from the purported authors of the reports confirming that they were in fact
10 modified. As set forth below, unsupported denials are insufficient to bring a fact into dispute.
11 However, the disputed facts are generally irrelevant to the disposition of this case. Where
12 relevant, the undersigned will address the purported disputed facts below if necessary.[4]

13                        **II. STANDARDS FOR SUMMARY JUDGMENT**

14          Summary judgment is appropriate when it is demonstrated that there exists "no
15 genuine issue as to any material fact and that the moving party is entitled to a judgment as a
16 matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

17          always bears the initial responsibility of informing the district court of the
            basis for its motion, and identifying those portions of "the pleadings,
18          depositions, answers to interrogatories, and admissions on file, together
            with the affidavits, if any," which it believes demonstrate the absence of a
19          genuine issue of material fact.

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

21 "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a
22 summary judgment motion may properly be made in reliance solely on the 'pleadings,

---

24      [4]    Defendants also objects to some of the documents Plaintiff provided, and the lack
        of affidavits supporting his position. However, the undersigned notes that Plaintiff's statements
25      and arguments are signed under penalty of perjury. Therefore to the extent these documents
        contain actual facts, the undersigned has treated those factual allegations, signed under penalty of
26      perjury, as an affidavit.

1  depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment
2  should be entered, after adequate time for discovery and upon motion, against a party who fails to
3  make a showing sufficient to establish the existence of an element essential to that party's case,
4  and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of
5  proof concerning an essential element of the nonmoving party's case necessarily renders all other
6  facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as
7  whatever is before the district court demonstrates that the standard for entry of summary
8  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

9         If the moving party meets its initial responsibility, the burden then shifts to the
10  opposing party to establish that a genuine issue as to any material fact actually does exist.  See
11  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to
12  establish the existence of this factual dispute, the opposing party may not rely upon the allegations
13  or denials of its pleadings but is required to tender evidence of specific facts in the form of
14  affidavits, and/or admissible discovery material, in support of its contention that the dispute
15  exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must
16  demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the
17  suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W.
18  Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
19  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the
20  nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

21         In the endeavor to establish the existence of a factual dispute, the opposing party
22  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
23  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
24  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
25  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
26  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1 committee's note on 1963 amendments).

2     In resolving the summary judgment motion, the court examines the pleadings,
3 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.
4 See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,
5 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the
6 court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.
7 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
8 produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen
9 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
10 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
11 show that there is some metaphysical doubt as to the material facts . . . . Where the record taken
12 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
13 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. DISCUSSION

15     Here, Defendants argue Plaintiff's claim of retaliation fail because they acted in the
16 interest of safety and had no retaliatory motive; Plaintiff's Due Process claims fail because he had
17 no right to call witnesses and present evidence at his Ad/Seg and ICC hearings; Plaintiff's claims
18 are barred for failure to exhaust administrative remedies[5]; and the Defendants are entitled to
19 qualified immunity.

**A.    Retaliation**

21     In order to state a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must
22 establish that he was retaliated against for exercising a constitutional right, and that the retaliatory

---

[5] The issue of exhaustion was previously addressed by a motion to dismiss, which was granted in part (Docs. 80, 83). In relation to the motion to dismiss, Defendants conceded that Plaintiff had exhausted his claims regarding retention in Ad/Seg (Doc. 72). In addition, as discussed fully infra, the undersigned finds it appropriate to grant the Defendants' motion on other grounds. As such, the undersigned finds it unnecessary to address the exhaustion argument herein.

1 action was not related to a legitimate penological purpose, such as preserving institutional
2 security.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).  In meeting
3 this standard, the prisoner must demonstrate a specific link between the alleged retaliation and the
4 exercise of a constitutional right.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995);
5 Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner must also
6 show that the exercise of First Amendment rights was chilled, though not necessarily silenced, by
7 the alleged retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000), see also
8 Rhodes v. Robinson, 408 F.3d 559, 569 (9th Cir. 2005).  Thus, the prisoner plaintiff must
9 establish the following in order to state a claim for retaliation: (1) prison officials took adverse
10 action against the inmate; (2) the adverse action was taken because the inmate engaged in
11 protected conduct; (3) the adverse action chilled the inmate's First Amendment rights; and (4) the
12 adverse action did not serve a legitimate penological purpose.  See Rhodes, 408 F.3d at 568.

13        As to the chilling effect, the Ninth Circuit in Rhodes observed: "If Rhodes had not
14 alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm
15 that is more than minimal will almost always have a chilling effect."  Id. at n.11.  By way of
16 example, the court cited Pratt in which a retaliation claim had been decided without discussing
17 chilling.  See id.  This citation is somewhat confusing in that the court in Pratt had no reason to
18 discuss chilling because it concluded that the plaintiff could not prove the absence of legitimate
19 penological interests.  See Pratt, 65 F.3d at 808-09.  Nonetheless, while the court has clearly stated
20 that one of the "basic elements" of a First Amendment retaliation claim is that the adverse action
21 "chilled the inmates exercise of his First Amendment rights," id. at 567-68, see also Resnick, 213
22 F.3d at 449, the comment in Rhodes at footnote 11 suggests that adverse action which is more
23 than minimal satisfies this element.  Thus, if this reading of Rhodes is correct, the chilling effect
24 element is essentially subsumed by adverse action.

25        Here, Plaintiff claims the defendants retaliated against him for his complaints
26 against official corruption.  He argues that he was placed and retained in Ad/Seg in retaliation for

7

his litigation against several prison officials, including defendants Walker and Pliler. He also claims that the defendants acted for the sole purpose of retaliating against him, and not for any true, legitimate peneological purpose. Defendants argue they had no retaliatory purpose for their action, and that their actions were grounded in security and safety of both Plaintiff and the institution.

The undisputed facts show Plaintiff reported that inmate Lyons had threatened him and an officer. On the same day Plaintiff made that report, he was placed in Ad/Seg. The official reason for placing Plaintiff in Ad/Seg was due to security and safety concerns. In addition to the immediate security and safety, Plaintiff had enemy issues which had to be addressed in order to secure his continued safety and that of the institution. Plaintiff acknowledges he has numerous enemies throughout the state. In addition, given the threats from inmate Lyons, it was apparent he had a potential new enemy at SAC.[6]

In order to prove retaliation, Plaintiff has to meet all of the elements. Even if he meets the first three, and can prove that the prison officials took adverse action against him because he engaged in protected conduct, he must also be able to prove that the adverse action did not serve a legitimate penological purpose. Here, Plaintiff admits he reported being threatened by another inmate. He also admits to numerous enemies throughout the state. Defendants have submitted evidence that retaining Plaintiff in Ad/Seg was reasonably related to a legitimate penological interest. Keeping Plaintiff away from the inmate who threatened him while they located a safe location to transfer him is a legitimate penological reason for retaining him in Ad/Seg.[7] Plaintiff's argument that it was unnecessary for him to be retained in Ad/Seg once

---

[6] As Defendants point out, whether inmate Lyons was a confirmed enemy due to the threat Plaintiff reported or due to inmate Lyons's detention in a holding cell or Ad/Seg following Plaintiff's report, the possible enemy situation had to be a concern to the safety and security of all involved, including the institution.

[7] Plaintiff argues Defendants had ulterior motives in keeping him retained in Ad/Seg, that is retaliation for his litigation against other officers. The Defendants have submitted declaration stating they were unaware of any legal actions Plaintiff had filed against them.

1 inmate Lyons was placed in Ad/Seg is unpersuasive.  It is not for Plaintiff or the court to decide
2 how best to handle safety and security issues.  Keeping Plaintiff in Ad/Seg until such time as he
3 could be transferred to an institution with less of a threat was a reasonable solution to the threat to
4 safety presented at the time.  As such, Plaintiff cannot meet all of the elements to prove retaliation
5 and Defendants are entitled to judgment on this claim.

**B.     Due Process**

The Due Process Clause protects prisoners from being deprived of life, liberty, or property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to prevail on a claim of deprivation of due process, a plaintiff must first establish the existence of a liberty or property interest for which the protection is sought.  See Ingraham v. Wright, 430 U.S. 651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).  Due process protects against the deprivation of property where there is a legitimate claim of entitlement to the property.  See Bd. of Regents, 408 U.S. at 577.  Protected property interests are created, and their dimensions are defined, by existing rules that stem from an independent source – such as state law – and which secure certain benefits and support claims of entitlement to those benefits.  See id.

Liberty interests can arise both from the Constitution and from state law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Meachum v. Fano, 427 U.S. 215, 224-27 (1976); Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).  In determining whether the Constitution itself protects a liberty interest, the court should consider whether the practice in question "is within the normal limits or range of custody which the conviction has authorized the State to impose."  Wolff, 418 U.S. at 557-58; Smith, 994 F.2d at 1405.  Applying this standard, the Supreme Court has concluded that the Constitution itself provides no liberty interest in good-time

---

Plaintiff submitted case numbers for legal actions he filed.  However, regardless of whether Plaintiff had initiated legal action against any of the Defendants or their fellow officers, the Defendants have provided the court with sufficient evidence to support a legitimate penological reason for keeping Plaintiff segregated.  Therefore, even if there were several reasons motivating the Defendants' actions, at least one is a legitimate reason, safety and security, and that is sufficient to defeat Plaintiff's retaliation claim.

1  credits, see Wolff, 418 U.S. at 557; in remaining in the general population, see Sandin v. Conner,
2  515 U.S. 472, 485-86 (1995); in not losing privileges, see Baxter v. Palmigiano, 425 U.S. 308,
3  323 (1976); in staying at a particular institution, see Meachum, 427 U.S. at 225-27; or in
4  remaining in a prison in a particular state, see Olim v. Wakinekona, 461 U.S. 238, 245-47 (1983).
5         In determining whether state law confers a liberty interest, the Supreme Court has
6  adopted an approach in which the existence of a liberty interest is determined by focusing on the
7  nature of the deprivation.  See Sandin v. Connor, 515 U.S. 472, 481-84 (1995).  In doing so, the
8  Court has held that state law creates a liberty interest deserving of protection only where the
9  deprivation in question: (1) restrains the inmate's freedom in a manner not expected from the
10 sentence; and (2) "imposes atypical and significant hardship on the inmate in relation to the
11 ordinary incidents of prison life."  Id. at 483-84.  Prisoners in California have a liberty interest in
12 the procedures used in prison disciplinary hearings where a successful claim would not
13 necessarily shorten the prisoner's sentence.  See Ramirez v. Galaza, 334 F.3d 850, 853, 859 (9th
14 Cir. 2003) (concluding that a due process challenge to a prison disciplinary hearing which did not
15 result in the loss of good-time credits was cognizable under § 1983); see also Wilkinson v.
16 Dotson, 544 U.S. 74, 82 (2005) (concluding that claims which did not seek earlier or immediate
17 release from prison were cognizable under § 1983).
18         If a prisoner is subject to non-disciplinary segregation, due process requires only
19 that prison officials "hold an informal nonadversary hearing within a reasonable time after the
20 prisoner is segregated," that prison officials "inform the prisoner of the charges against [him] or
21 the reasons for considering segregation," and that the prisoner be allowed "to present his views."
22 Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th Cir. 1986).  Due process does not require
23 "detailed written notice of charges, representation by counsel or counsel substitute, an opportunity
24 to present witnesses, or a written decision describing the reasons for placing the prisoner in
25 administrative segregation."  Id.  Further, "due process does not require disclosure of the identity
26 of any person providing information leading to the placement of a prisoner in administrative

segregation." Id.

Here, Plaintiff was placed in Ad/Seg on April 17, 2003. He acknowledges receiving a copy of the CDC Form 114-D which set forth the reasons and circumstances for his placement in Ad/Seg. He also acknowledges that a hearing was held on April 23, 2003. Further hearings were held on May 14, 2003, June 18, 2003, and August 27, 2003, and he was then transferred on September 9, 2003. He was therefore held in Ad/Seg for less than five months, and during that time officials held three review hearings. In addition, the decision to retain Plaintiff in Ad/Seg was certainly supported by some evidence, including the potential threat against him and his extensive enemy list, both of which invoke safety and security issues.

Plaintiff's objection with the procedures used relate to his ability to call witnesses and present evidence. He claims he requested witnesses both verbally and in writing, but was not allowed to call his witnesses at the hearing, nor was he allowed to present documentary evidence. However, as noted above, due process does not require the opportunity to present witnesses or documentary evidence at a non-disciplinary segregation determination hearing. Plaintiff acknowledges he was present at all but one of the hearings, and the one hearing he did not attend he did so by choice. Therefore, regardless of whether or not he submitted a request to call witnesses, the undersigned finds the Defendants did not violate his due process rights by failing to allow Plaintiff to call witnesses or present documentary evidence at the hearing.

### C. Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier

1 v. Katz, 533 U.S. 194, 201 (2001). If, and only if, a violation can be made out, the next step is to
2 ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of
3 the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the
4 official is alleged to have violated must have been 'clearly established' in a more particularized,
5 and hence more relevant, sense: The contours of the right must be sufficiently clear that a
6 reasonable official would understand that what he is doing violates that right." Id. at 202 (citation
7 omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in
8 similar circumstances would have thought his conduct violated the alleged right. See id. at 205.

9 When identifying the right allegedly violated, the court must define the right more
10 narrowly than the constitutional provision guaranteeing the right, but more broadly than the
11 factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th
12 Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently
13 clear that a reasonable official would understand [that] what [the official] is doing violates the
14 right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Ordinarily, once the court
15 concludes that a right was clearly established, an officer is not entitled to qualified immunity
16 because a reasonably competent public official is charged with knowing the law governing his
17 conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). However, even if the plaintiff
18 has alleged a violation of a clearly established right, the government official is entitled to qualified
19 immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not
20 violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also
21 Saucier, 533 U.S. at 205.

22 The first two steps in the qualified immunity analysis involve purely legal
23 questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a
24 legal determination based on a prior factual finding as to the government official's conduct. See
25 Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). In resolving these issues, the court must
26 view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

in favor of plaintiff. <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir. 2003).

As set forth above, the undersigned finds the Defendants did not violate any of Plaintiff's clearly established rights. However, assuming for this discussion that such a violation did occur, and the rights the Defendants presumably violated were clearly established, no reasonable officer in similar circumstances would have thought his conduct violated the alleged right. Plaintiff reported a threat made on his life by a fellow inmate. In order to protect Plaintiff's safety and the safety and security of the institution, a reasonable officer in such a situation could have acted as the officers did here by separating Plaintiff from other inmates. As Plaintiff argues, several other inmates heard inmate Lyons's statements and it would be reasonably prudent of the prison officials to keep Plaintiff away from all other inmates for his protection. In addition, Plaintiff acknowledges his extensive enemy list. In such a situation, no reasonable officer in a similar circumstance would have thought keeping Plaintiff in Ad/Seg for a few months while they found an appropriate housing assignment would have violated Plaintiff's rights.

Accordingly, the undersigned finds that if a violation of Plaintiff's clearly established rights were to have occurred, no reasonable officer in a similar circumstance would have believed his conduct violated Plaintiff's rights. Therefore, the Defendants here should be entitled to qualified immunity.

### IV. UNSERVED DEFENDANT

Finally, there remains one defendant unaccounted for in these proceedings. Service was returned unexecuted as to defendant Stiles. On May 5, 2009, the court issued an order directing Plaintiff to provide additional information to serve this defendant. Plaintiff then filed a request for assistance in obtaining service information for defendant Stiles, which the court granted to the extent discovery was reopened for the limited purpose of trying to find service information for defendant Stiles.

///

Defendants have now filed a notice that defendant Stiles' last know address has been obtained. Defendants have requested the court accept this information and keep it filed under seal during the pendency of this litigation, and return it to Defendants' counsel at its termination.

The claims set forth in the complaint relating to defendant Stiles are not unique to her. All of the claims against defendant Stiles relate to her position as a member of the ICC committee, and the hearings in which the ICC decided to retain Plaintiff in Ad/Seg and transfer him to another facility. As discussed above, these claims are subject to summary judgment. The undersigned found that Plaintiff's due process rights were not violated during the ICC hearings when he was not permitted to call witnesses or present evidence. Therefore, even though defendant Stiles has not been served and appeared in this case, Plaintiff's claims against her cannot survive summary judgment.

As the claims against defendant Stiles are subject to summary judgment, it would be an effort in futility to have her served by the U.S. Marshal at this late date. The undersigned finds it appropriate to enter judgment for defendant Stiles, and deny the request for the court to keep her address under seal during the pendency of this litigation. In the event these findings and recommendations are not adopted, and the district court finds it necessary to have defendant Stiles served, the court will entertain the defendants' request at that time.

## V. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Defendants' motion for summary judgment (Doc. 127) be granted;
2. Plaintiff's motion for summary judgment (Doc. 154) be denied;
3. Summary judgment be entered for defendant Stiles;
4. Judgment be entered in favor of Defendants; and
5. The Clerk of the Court be directed to enter judgment and close this case.

///

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 14, 2010

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE